This is primarily a Sixth Amendment case. The government deprived Coy Jones of his constitutional right to confront the witnesses against him when it introduced out-of-court statements from a confidential informant in order to fill the gaps in its purely circumstantial case. Those out-of-court statements... So was there any kind of curative instruction to the jury about this? An instruction was given to the jury, Judge Smith, telling them that one type of statement that was admitted was admitted not for its truth, but just to prove government, or just to show what law enforcement did, explaining their conduct. However, under this Court's precedence and the Supreme Court precedence, when an out-of-court statement implicates or incriminates a defendant, an instruction is not sufficient to cure that constitutional violation, and it wasn't sufficient here. Now, there were two types of statements, out-of-court statements, that were admitted at the trial. The first type were what I'll call predictive statements. These are statements from the CI that a drug deal is going to occur at a particular time and place, and that included, on May 3rd, the date of Mr. Jones' arrest. The second category of statements was an after-the-fact statement from the CI, and this was a statement that on May 3rd, Coy Jones, in fact, had received a large amount of methamphetamine. Now, the government's... I'd like to start with the after-the-fact statements. Unlike the predictive statements, which the defense learned about in pretrial discovery and which motivated the defense to file their pretrial motion to exclude, the after-the-fact statements were a statement that was never disclosed to the defense before trial. It was not disclosed in any of the discovery. It was not disclosed at two preliminary hearings, or at least the two that the defense was permitted to attend. It was not disclosed in the government's briefing. The very first time we heard about the after-the-fact statement was during the direct examination, the prosecution's direct examination of special agent... But it... I mean, their duty to disclose it, Brady Giglio, would only exist if the testimony came in for substantive proof. That's correct. I mean, this notion of a discovery compounding error only applies if you convince us that it was admitted for substantive proof. Judge Higginson, I believe that the reason their failure to disclose the statement is And under this Court's decision in Taylor, the defense cannot invite an out-of-court statement that we didn't know about. Well, let's say you asked the exact question, Agent Claiborne, how did you know a drug deal occurred? So, on cross, you said it, and then he said, well, you've asked it. Do you want the answer? And you say yes. And he said, well, the informant told me the drug deal had occurred. Had that been it? That would be arguably more invited error opening the door. Under Taylor, Judge Higginson, that still would not be invited error, because the defense had no way of knowing what the answer to that question would be. It's an extraordinarily foolish question from a defense lawyer, I must say, that that's exactly the answer you had... On its face, you're eliciting that. You're asking the question, and he pressed on with it. I found it very difficult. Well, the defense did not actually ask that question. In fact, the statement, the after-the-fact statement, was first introduced by the prosecution's own question on direct. And what the prosecution said was, quote, based on the information you received, Coy Jones had received a large amount of methamphetamine. That was the prosecutor's question. And what this court's decision in Kazee teaches is that you don't need the answer for a confrontation clause violation. The prosecutor's question alone can introduce the out-of-court statement, and that by itself was a confrontation clause violation. However, on Cross, we never asked the question, how do you know? We simply confronted the apparent inconsistency between a special agent who testified he didn't see anything, and then also testified... Well, the whole chronology is important, and it struck me looking at this transcript. We have very sophisticated lawyers that were not in artful questions at all. The government is pursuing a dangerous drug conspiracy, so before trial, they don't want their informants again be known. You accept that. You don't even object to the ex parte hearing, correct? I believe we did object to the holding an ex parte hearing. But ultimately, you agree if it's just a tipster, and it's done right, it doesn't infringe Kazee, then at various times, there were objections. It all then seems to me to come to a head with Claiborne. The government pushes it up to line and indirect questions, even withdraws a question that would go over the line. Then you on Cross want to come close and say, you don't know, agent. You can't even say you know if you heard it from the informant. But you're very careful. You say, you don't know, you just believe. And then the government on redirect, in the portion that's the most concerning to me, basically says, how do you know? And Judge Park says, you open the door, and that's the issue before us. Did you, in Cross, open the door to their redirect that frontally asked for retrospective substantive proof of guilt? No. Well, you say no, but have I described the chronology correctly? You have described the chronology of the examination of Claiborne correctly, but we did not open the door, again, for two reasons. One, the question itself on direct was sufficient alone for a confrontation cause violation because the prosecutor's question introduced the after fact statement completely. But did you object at that point? We did. And the government said, I withdraw the question. The first, Judge Higginson, the district court overruled our objection, and then the government, nevertheless, withdrew its question, asked a different question. Which is less incriminating as a result of just talking to somebody, what did you do? It's still predictive. That's hard for us to reverse with two limiting instructions. But I do agree with you, you've described it exactly right. Predictive is what you can elicit from an agent. If you talk to someone and then do stuff, and then you get into Kazee, is the response so inferential? The problem for me, what I'd focus on, is the redirect question. That no longer is what did you do, it's the informant told me the crime occurred. That's certainly the most egregious example. We did object to all of the CIA statements, pretrial, and there was a ruling on a pretrial motion, our motion excludes overruled, and Judge Higginson, you've mentioned that there were other predictive statements where we didn't object, and we didn't need to object because we had preserved those objections. But focusing on the after the fact statement and the redirect, that is the most egregious example and it was, I think the chronology here is on all forms with this court's decision in Taylor. We did not know about this after the fact statement. The direct testimony of the special agent revealed an inconsistency. That inconsistency being, I didn't see anything, but I know what happened. We then explore that inconsistency and really try and reveal it to the jury and say, there's no basis for this knowledge, and then the government uses that as an excuse to introduce this after the fact statement directly incriminating Floyd Jones. Taylor was exactly the same. In Taylor, there was an inconsistency in the government testimony between the type of gun that was used in the bank robbery, between an assault shotgun and an assault rifle. The defense, not knowing about the incriminating out-of-court statement, pressed on that inconsistency and said, well, you've got some people saying shotgun, some people saying rifle. You can't say whether it was one or the other. And then the government used that inconsistency with that kind of questioning as an excuse to introduce the out-of-court statement of the declarant that the gun that was found, the rifle, that he said, we hid it where you found it. And this court said that that was not an invited error, that was a confrontation clause violation and it required reversal. And that is exactly what's happened here. But as to the drug counts, right? Because the informant just said, well, I knew a deal had happened, there was no gun deal. So the gun counts stand? All four counts would be reversed really for two different reasons. Certainly the statements themselves related purely to the drug deal and didn't say anything about guns. But the drug deal and the alleged completion of that deal, the government's own position is that that's evidence not only for the drug counts, but also for the gun counts. Their theory is, well, the gun was found near where a drug transaction happened, so therefore that's evidence that Mr. Jones possessed the gun. And it's largely undisputed he's a convicted felon. And then the agent says, I drove back along the road and found the gun. Sounds like no matter what the informant said, that's just a jury question as to possession. Did he throw it out the window or not, right? No, I don't believe so, because the fact that he was previously convicted could not be used as evidence of the possession aspect of that count. But it's essential to the 922G. Am I wrong? There was a 922G? There was a 922G, but the jury couldn't use evidence of his prior conviction as evidence of possession. Obviously, there's the element of being a convicted felon. Also, one of the charges was possession of a firearm and furtherance of a drug crime. If there's no drug crime, you can't have that. But more so, I think, once the defense has established a confrontation clause violation, the burden shifts to the government to prove harmless error beyond a reasonable doubt, and that would apply to all counts. And based on the government's own theory about possession of the firearms, they can't show that introduction of that statement was harmless as to the conviction for any of the counts. That is, they can't show that there's no reasonable possibility that the CI's statement affected the verdict on any of the counts. So therefore, if the court finds the confrontation clause violation, that requires reversal of all four of the charges. Judge Sparks just said, open the door, that's it, move on. We have really no other reasoning than that expression. The after-the-fact statement, that's correct. And the government's brief largely defends this as invited error. I have always thought the two doctrines are subtly distinct. Do you think they are? And if so, why? I think opening the door and invited error are similar. Okay, so you don't think they're different? Not in this context. The two overlapping doctrines I see in this context are the argument that a statement is not offered for its truth and the invited error question. Because they all sort of come back to the same question, which the invited error or opening the door, what's really happening there is the courts are holding that the defendant, through its questioning, created an issue of credibility or something like that that made the statements relevant for a reason other than their truth. And so I think those two analyses do overlap, but they can be different in certain cases. Here I think they're largely the same. I think the government's argument could be characterized either as an invited error or opening the door, or it could be characterized as this statement, the after-the-fact statement was not offered for its truth, but was offered to rebut this challenge to Detective Clay Warren's, or I'm sorry, Special Agent Clay Warren's credibility. However, again, Taylor teaches us that when the defense doesn't know about the statement, we can't hamstring defense lawyers to not challenge apparent inconsistencies in the witness testimony out of fear that there may be some undisclosed, out-of-court statement that the government will then be allowed to introduce to explain that inconsistency. I mean, that's cross-examination 101 that defense lawyers must be entitled to do is that looks inconsistent, and I should confront the witness about that inconsistency. And so that's why the after-the-fact statement is an error that requires reversal of all four counts in this case. I would like to address briefly the predictive statements because, Judge Higginson, you mentioned that those are, I believe, okay and that we have no objection to those. That's not true. I think there are instances where law enforcement conduct needs to be explained, especially where it's been challenged, and therefore you can introduce statements like the predictive statements in this case. However, what Kazee teaches is that when a statement will connect the defendant to the crime, any introduction of that statement must be limited to exactly what's necessary to explain a challenged aspect of law enforcement conduct. Here, we never challenged why law enforcement was sitting at the gas station or why they  And yet, every time the government talked about any surveillance, they started by explaining this was due to a confidential informant tip that methamphetamine was going to be delivered to this location. More than that, when you look at their closing argument, you can see that the government really was asking the jury to accept these statements for their truth because the government argues specifically how reliable the confidential informant has been. In their closing argument, the government says, this is a confidential informant who has reliably told us where Reddy Cruz-Ortiz is going to be delivering the methamphetamine. The only reason to argue that reliability is because they're using those predictive statements not merely as background information, but because they want the jury to believe that when this CI tells you that a drug deal is going to occur on this date, a drug deal does in fact occur on that date. Now, finally, the harmless error analysis, I think, is easily answered by this court's precedents, both in Kazee and in Alvarado-Valdez. The fact that the government relied on these statements heavily, I think they mentioned out-of-court statements six times in their closing argument, including the after-the-fact statement. The fact that they relied so heavily on their closing argument, that's enough right there to show that the error was not harmless, and no way that they can meet their burden to show harmless error beyond a reasonable doubt. Can I see the time out of time? Yes, you've saved time for rebuttal. Thank you, Mr. Shank. Mr. Durbin? Good morning. May it please the Court. How many Fifth Circuit arguments now for you, Mr. Durbin? Judge, I lost count after 75. Okay. I'm not sure where I am, but I know I'm here this morning. I think there were three kinds of CI statements in this case. I think there's another way to look at it, and I think it fits within the confrontation analysis. I think there was one category of statements that came in that referred to the CI providing information that there was going to be a meeting of Eredy Cruz, the source of all of this, and it was going to be at a certain location, and it was for methamphetamine. That's classic tipster. Well, that's classic tipster, but it may go a little farther, and this doesn't help me, but it may go a little bit farther because it's saying the substance of, there's going to be this guy there to deliver meth. Yes. That would mean, explains why they go stake it out. It does explain why they go stake out, but the closing argument makes reference to those statements or that information to establish that Eredy Cruz is a source of methamphetamine. But that wasn't really disputed at the case. And I say that's subject to harmless error analysis if it's confrontation violative. What's the second category? The second category is the tip statements, and most of those came in through either, I believe it was the Officer Hanson, or those came in through Detective Langham, who was with Cedar Park Police Department. And those were, we had a tip, and we went and set up. The first objection at trial to these statements, by the way, was during the testimony of Hanson, and there was a question, did you have information, did you inform private information that Eredy Cruz was going to go do a dope deal, basically. There was objection. The district court sustained the objection. The, I don't want to misrepresent the record because it went back and forth a number of different times, but at that point, the district court gave a curative instruction and said use this only for the purpose of understanding why the agents did what they did, essentially. Which is good. Which is good. The, and the other tips were simply, did you have a tip that there was going to be something? Was there a tip that made no reference to, and none of these, by the way, made reference to the defendant Jones. All of them, if they referred to somebody, referred either to Eredy Cruz or an associate of Eredy Cruz who was going to be the distributor. Then we get to the retrospective statements. And then we get to the, and that's the last category, and that's the category that you pointed out, and those are the statements that came about during the examination of Agent Claiborne, and the prosecutor asked on direct, so why did you follow Mr. Jones on May the 3rd? And that question was raised by a prior cross-examination of other witnesses that challenged, criticized, contradicted the investigative techniques of the officers. Why did you follow this guy on that occasion? You didn't follow that guy on this occasion. You knew there was drugs on that occasion. You didn't make a stop. That had been set up through cross-examination, attacking the investigative techniques, essentially attacking the competency or the reasonableness of what the officers were doing. That was the defense, an attack on the investigative technique itself. And so the question for Claiborne was, okay, on this occasion, why did you follow him? And Claiborne said, because I knew that he had the drugs. Well, but very careful. He said, we knew Coy Jones had just received the large one. So that's the charge. Yes. But it's for the purpose of showing why the officer, or the officers, acted the way they did on May the 3rd, and it was for the purpose of, it was for the purpose of showing their state of mind, and I, there was no objection at that point. There was no instruction requested on that point. And I don't find anywhere in the record where the government argued that evidence to reach the conclusion that Jones was in possession. So in closing arguments, what usage of the prosecutor made of that? Was he arguing in the jury about the strength of the investigative techniques that had been attacked, or was he arguing it for what purpose? I don't think, I don't believe that that was argued at all, that particular point. The arguments went along these lines. You heard from the witness stand, Agent Claiborne, Detective Langham, reliable information about where and when Eredy Cruz is going to be delivering drugs. It wasn't that Jones was going to get it, it was Eredy Cruz. They were able to confirm what they're being told by their informant, based on information he gives them. That's the first time. The second, this is in the opening closing, and that's at 1145 of the record. As with all, as in all these cases, this is talking about September 20th. We start with the informant tip, an informant who's proven to be quite reliable in telling us where Eredy Cruz is going to be. That's still okay. September 28th, it starts with a tip from an informant that Mr. Cruz will be delivering narcotics to the target in Georgetown. Jumping to April 3rd, he says, as we always do, that Mr. Cruz will be delivering narcotics. This is the situation. Which brings us to May 3rd, and this is the one that's probably close, but I don't think it gets there. I would suggest that even if all we had was the evidence of what happened on May 3rd, that would be enough to prove beyond a reasonable doubt. But luckily, we have more. We have an informant tip again that someone from Eredy Cruz's organization is going to be delivering methamphetamine at this gas station in Liberty Hill. And those are the circumstances. I don't find anything where it was used to say, we knew that he had it. I'm just going to read it aloud, and you know it's there. How do you know the drug deal happened? This is in closing argument, the government. Well, the informant told me, right? We called the informant and said, did the deal happen? And he said, yep, it sure did. And that's why they chose to follow him. We called the informant and said, did the deal happen? And he said, yep, it sure did. How could the defendant cross-examine that informant who, in closing, is the one, the jury here said, yep, the deal happened? And that's the crux of it. But that, to me, is just, I'll just be blunt, because your experience, that's a completely improper argument. In closing, they're not saying, and you heard the informant told us where to go. They're saying, you heard the informant say the deal happened. There's just no, I mean, I don't think even Judge Sparks thought that that wasn't a confrontation clause violation. He just said, you open the door. So in my mind, we're in a world of waiver and harmlessness. It's not, somehow that's not classic. And I think it gets down to harmless. Okay. That's important, and I appreciate that. So you are saying this was error. It's just a question of, was it harmless? I don't think I can say a word. I don't think you can, I agree. And I think that you asked a question about the difference between opening the door and inviting the error and so forth. But as I read the cases, at least in this context, in the context of confrontation, I don't think that the invitation in this circumstance, the invitation was to establish what the basis for the officer's actions were and what their knowledge was. And so if the evidence comes in for that and is used for that purpose, that's not a violation. I don't think it means the doors are blown off and now, you know, it's ready to go. But the problem, as he said, again, I think at all levels, trial and non-appeal, this is a very sophisticated argument, but he was careful to say that this case is uniquely difficult for the defense because the ex parte hearing that happened in October of 2017 is the first time that the government elicited from A.C. Claiborne, oh, in addition to telling us where to go, he also told us the deal went down. But they don't get disclosed that. So they ask when on direct, the government says, what did you do, Claiborne? You got pretty close. Why? Well, we spoke to the informant. That's why we're there. It's still right on the edge. So why do they get disclosure of that? That's not really... Well, because once it's going to be used substantively, you have to disclose the impeachment because in that same ex parte hearing, the government elicits from Claiborne that this C.I. was getting benefits, money and immigration benefits. But I think at the time, it wasn't the plan to use that. But then it evolved that you did use it on redirect the exact... We did and they knew about it. And I'd point to you the cross-examination of Detective Langham later in the case where they asked the same types of questions. You had no suspicions. You had no hard proof. That's important. I didn't know that record wise. So your position is at trial, they knew that... Now they know. No, let me finish my question. Your position is the record will reflect that at trial, they knew this C.I. not only said a deal will go down, but that the deal did go down. No, I won't say that they knew it before the questions were... But then they... That's why on cross, it's an innocent defense question to say, how did you know? Because they haven't yet been told that Claiborne knew from the informant that the deal actually happened. They weren't given that testimony. But why were they entitled to that testimony? Because it's impeaching. But they're not entitled to all impeachment. If you're going to use it substantively, they have to get it. If you're going to get through Claiborne, that the reason he knows this deal happened, even though no one saw the guy, is because the informant told him, yup, it went down, which is exactly what your prosecutor elicited on redirect. It's exactly how it's used in closing. So once it becomes substantive evidence, the best proof of guilt is the informant said it happened. Well, they've got to have the evidence that the informant was being paid money and giving immigration benefits. Do you see my point? I do see your point. And I can't tell you that the record is clear enough for me to make representations. The judge said, if there's something, get the reports. I don't know what happened after that. Right, I don't know. I don't know if there were reports given. I know there was later questioning on cross-examination of Detective Langham about reports that she might have had about the informant information the informant provided. And I believe Detective Langham said, basically, I didn't keep that kind of stuff. I don't have that kind of stuff. But I won't rely on that. These are tricky cases. I think the government's trying to stay on the edge. What did we do? Therefore, we did it for this reason. But then the cross is close, arguably inadvertent. They don't even know. They walk close to it. But the cross doesn't say, how did you know? That would be them inviting there. It says, you didn't know. You didn't know. You just believed. Okay. But that opened it up to respond to. What's your best case that a defense cross-examination question allows the government, then, to actually ask the substantive proof question? That's a sort of what I think of as fire with fire. What's the best case? I'm asking the best case. Where does cross open up, redirect, to actually turn the informant into an affirmative witness? I don't have a case in mind. I don't think it exists. Well, this may be it. It might be. And I'm just one judge up here. I'm just one judge. No, and I appreciate this. This might be it. I agree. Because twice, Judge Sparks says to the jury, don't use it, don't use it. He says it twice. And I go back to, look, this was the defensive theory. And so the questioning, if you left the questioning alone after the cross, it was, you believed, didn't you? No, I knew. No, you believed, didn't you? No, I knew. You believed. Well, I'm going to tell you, I knew. Oh, so you leave that alone. Okay, and so what's the defense use of that? Now, you go back to what their defense is. Yes, they can. Their defense had been investigators were sloppy. They didn't do what they were supposed to do. And their theory is they had something like, they didn't use these words, but something like confirmation bias. They had decided that Mr. Jones was guilty and they were going to do everything to make him look good. But then doesn't the prosecutor say sidebar? Can we come to sidebar, Your Honor? They've just forced me to use it substantively. So we need to disclose the identity. We need to give you some giggly of discovery because my witness is now going to say how he knew. That would have been a good practice. But that's not what happens.  that at that point, the defense would have had an argument that, look, not only did they take bad investigative techniques, not only were they advocates, the officers were advocates when they came in here, but they wouldn't even admit that they didn't know. They wanted you to believe they knew and they wouldn't even admit it. You watched Agent Claiborne. I asked him, you believed? And he sat there smugly and said, no, I knew. He didn't know. There's no way he couldn't. They are very difficult. There's no question. But it doesn't come to your mind what the closest invited error... Well, maybe back to that question. Do you think there's a difference between the two doctrines? Open door, invited error? To be honest with you, I had not thought about it before. I think that they get used interchangeably. I thought invited error was sort of waiver. The error occurred, but they triggered it. So just look at this for harmlessness. It might be, but as I read the confrontation clause cases, Chizzie, and I think it's not so, but it might be that Sarli case that I said. As I read them, look, what they're opening is they're opening it for a proper use, not for a use that goes beyond its... So I think it was open for a non-hearsay use. Then the question is, well, this is one of those statements that not only has a non-hearsay use, but it also directly implicates. Now, is that a different problem? It has to be a harmlessness question. I think at the end of the day, it is going to be a harmlessness question. I think at the end of the day, the fact that Redicruz was the source and was distributing methamphetamine, even though some of that was probably proved with hearsay, was not disputed. There was no... He was at every one of those all but the last of those eight transactions. There were eight surveillances. They get kind of lost in the record as I read it. Sarli is an easier harmlessness question. Sarli is. It was only mentioned twice. This one is more difficult. But this particular circumstance had the defendant, Jones, meeting with Redicruz or his associate on the last occasion five different times. They were all very similar. They were in some parking lot. One of them was sort of broken up and the suspicion is that it was because they made surveillance. On two of those, not involving Jones, but two of those, on one of those meetings with Cruz, there was 700 grams of meth that was seized from the guy who met with him under very similar circumstances. The other one involved Imran Rehman, who testified at trial that he had 25 to 30 similar meetings with Redicruz in which he got quantities of methamphetamine. This particular scenario was identical virtually to all of those. Is there a stronger case for the guns that it's harmless? Or do you think they all live or die? I'll tell you the truth on the guns. I think the guns are the hard case. I don't think the drugs are the hard case. Nobody ever saw them with a gun. I know, but that's a sufficiency. It is a sufficiency. If we were to find error on confrontation, would it bleed into, taint the gun convictions? Well, you all haven't asked the question, but I want to be honest with you. I think the question is the gun conviction. We put in the prior gun conviction. We'd already proved he was convicted with the prior methamphetamine conviction. Do you think that made a difference? You're asking me. Well, I think it's a rhetorical question. You're going to answer that. I'm putting it out as a rhetorical question. I used to be nervous when I had to answer the question. You're getting me nervous again. That's why I'd rather ask him. I think the guns are a closer case, but I don't think the drugs are. I think the drugs, I think it's harmless given all of those circumstances and given the way the case was tried. As I say... What's the relevance of the gun? What's the relevance here of the gun evidence? I won't ask another question like that. I think I know the answer, so go ahead. Well, he was charged with two gun kills. Of course, but this question... Never mind. Based on the same conduct, and the evidence was the gun in the cactus and there was a whole bunch of testimony back and forth whether this gun could get in the cactus going down the road being thrown out the window at 80 miles an hour, which there's no expert testimony and who knows how a gun bounces when it hits the road going 80 miles an hour. It was impaled in a cactus? Somehow, and there's photos of it, but somehow it was squashed inside the cactus. That was a quarter mile from where Mr. Jones stopped. The methamphetamine was a half mile from where Mr. Jones stopped on the opposite side of the road after his high-speed chase 90, 80, 90 miles an hour. The gun theory was and there was testimony from, I believe, two agents. Is it your experience that drug dealers carry guns? Yes. Why do they do that? The purpose of that is to protect their product and to protect themselves. That was the evidence together with the high-speed chase. The gun is tied to the drugs, but the evidence of the drugs comes from the involvement of Eddie Cruz, the distributions and that's why I say the case for the drug convictions is a much stronger case because the guns where the circumstance is he was dealing drugs, drug dealers have guns, and the gun wasn't very far from the meth and it was between the meth and where he eventually stopped with both his windows down and he gave up. I agree. At trial, the harder case is the gun, but once you've got the witness who can't be crossed saying the deal went down, sounds like the drugs is a pretty easy case. They can't impeach that guy. I guess I'm looking at it from the other standpoint is independent of that. I think the gun is sufficient, but I think there's another component in here because there was a prior gun conviction that was put in and one might ask why did you put that in? You already proved that he was a felon. I see the gun convictions as kind of different. I think at the end of the day when you look at what those statements were and how they were used and what the other evidence was and the circumstances were, I think that this does even survive harmless beyond a reasonable doubt. Any other questions? Thank you. Thank you. Judge Higginson, you asked for the government's best case on invited error and the government couldn't give you one and I think the reason is because Taylor is the case on invited error that applies here and Taylor supports the argument or supports the finding that the defense did not invite the after the fact statement in this case. I will state unequivocally the after the fact statement was not disclosed to the defense before it came out on the direct examination of Agent Claiborne at trial. It was not disclosed at either of the preliminary hearings. It's not as clear it came out on direct. It definitely comes out on redirect. Whether it's direct or redirect. But that makes a difference because Judge Sparks' whole ruling here turns on the notion that in cross you quote open the door. That was Judge Sparks' ruling, correct. That's what we're reviewing. Right, but we also objected to the question on direct. And then they withdrew it and asked a more innocuous forward looking question. Well, I'm not sure. Anyway, you keep going with your argument. Right, right. So that case, the best case is Taylor. And the two cases that they did cite in their brief, I think it's Octave and Jimenez where the court found that error was invited show exactly why they don't apply here. In both those cases, the defense knew about the statement beforehand. The government actually agreed not to introduce the statement. And then the defense tried to exploit that agreement by attacking the credibility of law enforcement officers and making it seem like there were gaps in their knowledge. When they knew there weren't gaps, they just thought that the government's agreement not to introduce the statements would protect them. It's the actual opposite position here. My suggestion just in your time is he's essentially agreed there's error. It's all about harmlessness now. In harmlessness, I think this is an easy case. I think it's easy if you look at the facts of Kazee and you also look at Sarli. In Kazee, you have the out of court declarant. Police watch him go to the house, have a short communication with the defendant, walk away. They arrest him, find drugs on him and he says, I got the drugs from the defendant. I bought drugs from him before. The police then get a search warrant, go to the defendant's house. The defendant answers the door, sees the police, slams the door. The police break down the door and they find the defendant over the toilet with a five gallon jug of water pouring it down the toilet trying to flush something. They then search the house and they find over $1,000 in cash, they find more crack cocaine, they find guns, they find a money counter, they find three surveillance cameras that are still wrapped up, and at the end of all of that, this court still held that the error was not harmless. And the reason was even though there was all this circumstantial evidence, the only direct evidence that tied the defendant to the drugs in the declarant's pocket was a declarant's statement. That is exactly the case here. None of the law enforcement officers on May 3rd saw Coy Jones exchange anything with anybody. No one witnessed an exchange. The only evidence of Coy Jones' possession of the methamphetamine or the gun is purely circumstantial. The only direct evidence that was introduced was the statement by the confidential informant that Coy Jones had received a large amount of methamphetamine. The evidence here is weaker than Kazee, and I think Sarli just demonstrates the point by giving you the other side. I mean, in Sarli, the issue there was the CI's statement. There was a mismatch between the informant's statement and the challenged element of the crime. There's no doubt that the defendant in Sarli had the methamphetamine. He just claimed he didn't know the box of cat litter he had just been paid to take somewhere contained methamphetamine. But the statement, the CI's statement, didn't go to that intent element. It went only to possession. Here, there's no mismatch between the CI's statement and really the challenged element. They're exactly the same, which is what happened in Kazee. I want to just briefly touch on the instruction sufficiency point, because I think it's important. As this court held in Harper, the 2008 case, and in Rodriguez in 1975, when a non-testifying witness's out-of-court statement incriminates a defendant, an instruction is not curative. That comes from the Bruton line of cases, but it has been applied outside of cases that involve co-defendant testimony. That makes sense, because if you have a law enforcement officer up there on the stand saying this witness that you're never going to hear from has incriminated the defendant, that's so harmful that the usual presumption that jurors will follow the instructions is waived, and that was the Supreme Court's holding in Bruton that this Court has extended to non-co-defendant cases. I see I'm out of time. Yes, thank you, Mr. Bruton. Thank you. The case is under submission.